## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NATHAN PETTUS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-6813** |
| **N. BURL CAIN** | **SECTION: "A"(1)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Nathan Pettus, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On December 3, 2009, he was convicted of simple robbery under Louisiana law.[1]  On December 16, 2009, he was sentenced to a term of seven years imprisonment.[2]  On May 24, 2011, the Louisiana Fifth Circuit Court of Appeal vacated his sentence and remanded the matter for resentencing.[3]  On July 7, 2011, the state district court again sentenced petitioner to a

---

[1] State Rec., Vol. 5 of 7, transcript of December 3, 2009, p. 163; State Rec., Vol. 1 of 7, minute entry dated December 3, 2009; State Rec., Vol. 1 of 7, jury verdict form.
[2] State Rec., Vol. 5 of 7, transcript of December 16, 2009; State Rec., Vol. 1 of 7, minute entry dated December 16, 2009.
[3] State v. Pettus, 66 So.3d 1192 (La. App. 5th Cir. 2011); State Rec., Vol. 1 of 7.

term of seven years imprisonment.[4]  On May 22, 2012, the Louisiana Fifth Circuit Court of Appeal

then affirmed his conviction and sentence,[5] and the Louisiana Supreme Court denied his related

writ application on January 11, 2013.[6]

On April 11, 2014, petitioner filed an application for post-conviction relief with the state

district court.[7]  That application was denied on September 10, 2014.[8]  His related writ applications

were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on November 6, 2014,[9]

and by the Louisiana Supreme Court on October 2, 2015.[10]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief with

respect to his simple robbery conviction.[11]   The state has filed a response arguing that the

application is untimely.[12]  The state is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires

that a petitioner bring his Section 2254 claims within one (1) year of the date on which his

---

[4] State Rec., Vol. 6 of 7, transcript of July 7, 2011; State Rec., Vol. 1 of 7, minute entry dated July 7, 2011.

[5] State v. Pettus, 96 So.3d 584 (La. App. 5th Cir. 2012); State Rec., Vol. 6 of 7.

[6] State v. Pettus, 106 So.3d 546 (La. 2013); State Rec., Vol. 6 of 7.

[7] State Rec., Vol. 1 of 7.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  The date on which that occurred with respect to petitioner's post-conviction application is not apparent from the record.  Out of an abundance of caution, the undersigned will consider the date on which petitioner signed the affidavit on his application as the filing date, in that the application obviously could not have been placed in the prison mailing system prior the date on which the affidavit was signed.

[8] State Rec., Vol. 1 of 7, Order dated September 10, 2014.

[9] State ex rel. Pettus v. Cain, No. 14-KH-840 (La. App. 5th Cir. Nov. 6, 2014); State Rec., Vol. 7 of 7.

[10] State ex rel. Pettus v. State, 178 So.3d 987 (La. 2015); State Rec., Vol. 7 of 7.

[11] Rec. Doc. 4.  The Court notes that petitioner states that he is challenging his simple robbery conviction and his accompanying memorandum addresses only that conviction.  Although his application form also references a conviction date, docket number, and sentence he received in a different proceeding, specifically a proceeding in which he was convicted of theft and sentenced to a term of life imprisonment as a fourth offender, those references appear to be errors, in that no claims are asserted with respect to that conviction.  Moreover, out of an abundance of caution, the Court notes that petitioner has already sought and been denied habeas corpus relief with respect to that theft conviction.  Pettus v. Cain, Civ. Action No. 14-1685, 2015 WL 1897711 (E.D. La. Apr. 27, 2015).  Accordingly, before he could file a second or successive application with respect to that conviction, he would have to first obtain authorization from the United States Fifth Circuit Court of Appeals.  See 28 U.S.C. § 2244(b)(3)(A).

[12] Rec. Doc. 19.

underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[13]  On that point, the

United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging
> a state conviction begins to run on "the date on which the [state] judgment became
> final by the conclusion of direct review or the expiration of the time for seeking
> such review."  28 U.S.C. § 2244(d)(1)(A).  *When a habeas petitioner has pursued*
> *relief on direct appeal through his state's highest court, his conviction becomes*
> *final ninety days after the highest court's judgment is entered, upon the expiration*
> *of time for filing an application for writ of certiorari with the United States Supreme*
> *Court.*  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application

on January 11, 2013.  Accordingly, his state criminal judgment became final for AEDPA purposes,

and his federal limitations period therefore commenced, on April 11, 2013.  The limitations period

then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA

expressly provides:  "The time during which a properly filed application for State post-conviction

or other collateral review with respect to the pertinent judgment or claim is pending shall not be

counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

After three hundred sixty-four (364) days elapsed, petitioner tolled his federal limitations

period by filing a post-conviction application with the state district court on April 11, 2014.

Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long

as he sought supervisory review in a timely manner.  Grillette v. Warden, Winn Correctional

Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  Assuming for the purposes of this decision that

---

[13] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

petitioner's related writ applications were timely filed,[14] the undersigned finds that tolling therefore continued until the Louisiana Supreme Court denied relief on collateral review on October 2, 2015.[15]

However, due to petitioner's extended delay in seeking *state* post-conviction relief, he had only one day of his *federal* limitations remaining when that period resumed running on October 2, 2015. Accordingly, he had only until October 3, 2015, either to again toll the limitations period or to file his federal application.

Petitioner filed no other applications for "State post-conviction or other collateral review." Therefore, he clearly is not entitled to further *statutory* tolling.

The Court must next consider *equitable* tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

---

[14] The state does not argue that the applications were untimely.

[15] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

Lastly, the Court also notes that the United States Supreme Court has held:   "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).  Here, petitioner does not invoke McQuiggin. However, even if he were to invoke McQuiggin and argue that he is actually innocent in any objections to this Report and Recommendation, that argument should be rejected for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned:   "[T]enable actual-innocence gateway pleas are rare:   '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted).  With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's conviction is based.  That evidence is recounted in the Louisiana Fifth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

Angel Bougon testified that, on April 23, 2008, she was working at her boutique on the first floor of Old Metairie Village, a strip shopping center at 701 Metairie Road.  At approximately 12:40 p.m., a man opened the door of her shop, put a cloth over his face, and started coughing.  Mrs. Bougon described him as a stocky white male of average height wearing khaki shorts, a white button-up men's dress shirt hanging out of his shorts, a white hat, and large sunglasses.  She started backing up and told him not to give her whatever he had.  As he was approaching the counter, the man said that he had just gotten over bronchitis.  The man walked to the side where Mrs. Bougon was standing, coughed again, and said, "Don't get scared, give me your money."  Mrs. Bougon asked if he was kidding, and he said, "Don't make me get violent, get the money."  She pointed to her cash register, and the man said, "Well, go get it."  Mrs. Bougon walked to the register, and the man met her there.  He said, "Give me your money," so she opened up the register and gave him the money, which was approximately $250.

The man asked Mrs. Bougon where the rest of the money was, and she replied that that was all she had.  The man told her to lift up the cash register drawer, so she removed it and told him that there was no more money.  The man hesitated a few moments and said, "Where's your purse? Get your purse."  When Mrs. Bougon did not respond, the man said, "Don't make me get violent. Get your purse."  She got to the back door of the store before the man did, and she had almost closed the door, but the man pulled it open and said, "I don't think so. Get your purse."

Mrs. Bougon's purse was sitting on a chair across the room, so she told the man, "There's my purse.  Go get it."  The man told her to go get it.  She walked over to where her purse was, and the man did also.  While the man was engrossed in the purse for a moment, Mrs. Bougon ran out of the back room.  She made it to the front door, screaming, and she pushed the door open with her right hand.  Mrs. Bougon had the phone in her left hand, which she had picked up before she left the counter to go into the back room.  Before she could get out of the store, the man grabbed her hair and pulled her back into the store.

Mrs. Bougon fell on the floor, still screaming, and she was kicking.  She saw the contents of her purse on the floor.  The man leaned over Mrs. Bougon while she was on the floor, but she did not know why.  Afterward, the man got up and left, and Mrs. Bougon got up and ran after him while calling 911.  When she ran out of the door, she turned left, which faced Focis Street, and saw the man one store down at the end of the breezeway.  By the time Mrs. Bougon got to the end of the breezeway, the man was gone.  She stood in the middle of the parking lot while she was on the phone with the 911 operator, screaming and waving her arms to get attention and help.  She then saw a black BMW that was backed into a parking place and a person wearing a white shirt and white hat crouched by the rear of the car on the passenger side.

Mrs. Bougon heard a click of the remote that one would use to unlock a car.  While crouching, the man circled the car from the passenger side around the back of the car until he reached the driver's side door.  He got into the driver's side of

6

the car, and quickly drove off.  When he left the parking area, he exited on Focis Street and turned left.  Mrs. Bougon was able to see the license plate number on the BMW, which she relayed to the 911 operator.

Afterward, Mrs. Bougon went back inside her store where she saw the contents of her purse all over the floor.  While she was looking on the floor and wondering why the man was leaning over her and what he might have taken, she saw a syringe, which did not belong to her.  Mrs. Bougon later gave a statement to the police.  She was shown a photographic lineup, but she could not identify the man who robbed her.  Mrs. Bougon explained that she did not get a clear look at the man's face because he held the cloth over his face during the entire incident.

Michael Sackett testified that, on April 23, 2008, around lunchtime, he was driving his car down Focis Street when he observed a lady (Mrs. Bougon) coming around the corner of the shopping center screaming and waving a phone at a man.  Mr. Sackett also saw a man hidden behind the right side of a black BMW.  The man's back was to Mr. Sackett, and the back of the car was facing Mr. Sackett.  The lady kept screaming and getting closer to the man hiding by the car.  The man was holding his shirt up to hide his face, and he had a key in his hand.

The man opened the door from the passenger side and then slipped into the front of the car, climbed over the console, got into the driver's seat, and started the car.  He never turned around and Mr. Sackett did not see his face.  The BMW exited the parking lot and turned left onto Focis Street.  Mr. Sackett relayed the license plate number of the BMW to the police and followed the car until it got to the Stewart Building in the 100 block of Veterans Boulevard.  The BMW entered the parking lot behind the Stewart Building, and Mr. Sackett parked outside of the building and remained in that position and on the phone with the 911 operator until the police arrived.  The BMW did not leave the parking lot while Mr. Sackett waited there, on the shoulder of the street, for the police.  Mr. Sackett was familiar with the parking lot, and he would be able to see anyone exiting.

Mr. Sackett described the man he saw as a white male wearing a white shirt covering his head, a baseball cap, tennis shoes, and khaki, Bermuda-type shorts that went past his knees.  He testified that the man was young, well-built, about 6' or 6'1", and about 170 to 180 pounds.  Mr. Sackett gave a statement to the police and was shown a photographic lineup; however, he could not identify anyone because Mr. Sackett never saw the man's face.

Detective David Mascaro of the Jefferson Parish Sheriff's Office testified that he investigated the robbery.  The crime scene was processed, including the syringe found on the floor.  After the detective was provided with the license plate number of the black BMW driven by the suspect, he conducted a "computer check," and learned that it was registered to Tracy Garcia, eventually learning that she was Pettus' fiancé and the mother of his child.  Detective Mascaro testified that Ms. Garcia reported that her BMW had been stolen twenty minutes after the robbery.  In accord with Mr. Sackett's report, the car was ultimately located at the Stewart Enterprises parking lot.  The car was secured for evidence, towed, and processed.

7

Detective Mascaro met with Ms. Garcia, who was staying with a friend just off Metairie Road, at the same address from where she reported that her BMW had been stolen.   From that location, Detective Mascaro took Ms. Garcia to the investigations bureau.  While en route, Pettus continuously called Ms. Garcia's cell phone.  Pettus then talked to Detective Mascaro over the phone and instructed him not to speak to Ms. Garcia regarding her BMW.  When the detective asked Pettus to explain what happened with Ms. Garcia's vehicle, he replied that he could not because he was in Houston, Texas.   Once Detective Mascaro and Ms. Garcia arrived at the detective bureau, they had a conversation, after which he prepared an arrest warrant for Pettus.  Ms. Garcia told the detective that Pettus "had the vehicle," and that he was staying with her and her friend at the Metairie Court address.

Detective Mascaro retrieved numerous items from the BMW including a man's white dress shirt in size XXL; a white tank top T-shirt; two other T-shirts; two cash receipts for purchases at Rite-Aid; assorted handwritten notes; a handwritten prescription in Pettus' name for Lorcet dated April 21, 2008, three days before the robbery, with an address of 1356 Silvia Street in Metairie, and a prescription in Tracy Garcia's name for Lorcet with the same date and address; a man's watch; a pair of brown sunglasses; and a bottle of Distiller's Row Vodka.

The detective collected the white dress shirt, which was draped across the seat of the BMW, and the white T-shirt because he believed they were used in the robbery, and identified State's Exhibit 48 as the shirt and the tank top he collected from the vehicle.  The victim positively identified the man's white dress shirt as a shirt that looked similar to the one the robber was wearing.  She also positively identified the white tank top, stating that it looked similar to the one the robber had in his hand when he was covering his face.

The first cash receipt, which was from the Rite-Aid on Metairie Road directly across the street from the strip mall where the robbery occurred, showed a purchase of Distiller's Vodka at approximately 8:30 a.m. on the morning of the robbery.  The second receipt, which was from the Rite-Aid in the 700 or 800 block of Veterans Boulevard, showed a purchase of Distiller's Vodka at 12:22 p.m., approximately twenty minutes before the robbery occurred.   The Rite-Aid on Veterans Boulevard was very close to where the BMW was recovered.

Detective Mascaro went to each Rite-Aid and obtained video surveillance, which was played for the jury.  With respect to the video obtained from the Rite-Aid on Metairie Road, Detective Mascaro positively identified Pettus entering the store, talking to the cashier, and then exiting the store.  He testified that there was a clear shot of Pettus' face at one point on that video.  Detective Mascaro noted that the man in the video was wearing tan or khaki cargo shorts, white tennis shoes, a tan or light-colored cap, and a black shirt.

Detective Mascaro testified that the video obtained from the Rite-Aid on Veterans Boulevard showed Pettus wearing the same shorts and shoes that he observed in the first video, but that Pettus was now wearing a white long-sleeved button-up shirt and sunglasses hanging on the front of the shirt.  He further testified that the clothes being worn by Pettus at 12:22 p.m. on the videotape matched the

description of the clothing worn by the robber approximately twenty minutes later. The detective explained that the Rite-Aid clerk at the Veterans store recalled Pettus because she had a detailed conversation with him as he purchased the vodka. The clerk remembered that Pettus told her he had just found out that his girlfriend was pregnant and that he was covering his mouth because he had a toothache. Detective Mascaro asserted that it took approximately five minutes to drive from the Rite-Aid on Veterans Boulevard to the 700 block of Metairie Road where the robbery occurred.

Pettus was arrested in Houston in July 2008. After obtaining a search warrant for his body, Detective Mascaro also had a crime scene technician obtain a buccal swab from Pettus for DNA testing. Sarah Corrigan, an expert forensic DNA analyst, testified that the wash from the syringe was compared to the buccal swab taken from Pettus, and it was consistent with a partial profile; therefore, he could not be excluded as a donor. Ms. Corrigan further testified that they were able to identify "four of the 13 markers." She stated that, for the four of the thirteen markers tested, the genetic profile made from the wash of the syringe occurred with a frequency of approximately one in 33,000 persons of the Caucasian population, one in 250,000 persons of the African-American population, and one in 47,000 persons of the Hispanic population.

Additionally, Detective Mascaro instructed the crime scene technician to try and obtain fingerprints from the rear passenger side of the BMW where the suspect was seen crouching and from the pint-sized bottle of vodka found on the passenger side floorboard in the BMW. Aisha Prudhomme, a fingerprint expert, testified that two prints were obtained from the exterior passenger side door window of the BMW (the right middle finger and the right ring finger) and that the left middle fingerprint was obtained from the vodka bottle found inside the BMW, and all of them belonged to Pettus. No usable prints were obtained from the crime scene.[16]

The foregoing "old evidence" evidence was obviously compelling evidence of guilt, and petitioner would therefore face a daunting burden to present a credible "actual innocence" claim. Specifically, the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S.

---

[16] State v. Pettus, 96 So.3d 584, 587-90 (La. App. 5th Cir. 2012); State Rec., Vol. 6 of 7.

298, 324 (1995) (emphasis added).  Here, petitioner presents no new evidence whatsoever, much less any evidence of the type or caliber referenced in Schlup.  Therefore, he has not met "the threshold requirement" for McQuiggin to apply, i.e. a showing that "in light of the *new* evidence, *no* juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup, 513 U.S. at 329; emphasis added).  Accordingly, McQuiggin does not aid petitioner.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for *habeas corpus* relief had to be filed no later than October 3, 2015, in order to be timely.  His federal application was not filed until after that date,[17] and, therefore, it is untimely.

Lastly, the undersigned notes that although petitioner's application was filed only a matter of weeks past the deadline, "the magnitude of [a petitioner's] tardiness" simply is not a proper consideration in determining the timeliness of a federal habeas application.  Lookingbill v. Cockrell, 293 F.3d 256, 264 (5th Cir. 2002).  As the United States Fifth Circuit Court of Appeals has explained:

> At the margins, all statutes of limitations and filing deadlines appear arbitrary. AEDPA relies on precise filing deadlines to trigger specific accrual and tolling provisions.  Adjusting the deadlines by only a few days in both state and federal courts would make navigating AEDPA's timetable impossible.  Such laxity would reduce predictability and would prevent us from treating the similarly situated

---

[17] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  No evidence of that date is contained in the record; however, the Court notes:  (1) petitioner signed his federal application on an unspecified date in November of 2015, see Rec. Doc. 4, p. 6; (2) he signed the Affidavit/Certificate of Service on the accompanying memorandum on November 8, 2015, see Rec. Doc. 4-1, p. 15; and (3) his application was received in the prison's Legal Programs Department for emailing to this Court on December 9, 2015, see Rec. Doc. 4, p. 7.  *All* **of those dates are** *after* **October 3, 2015, the date on which petitioner's federal filing deadline expired.**

equally.  We consistently have denied tolling even where the petition was only a few days late.

Id. at 264-65 (footnote omitted).

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that federal application for habeas corpus relief filed by Nathan Pettus be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[18]

New Orleans, Louisiana, this thirtieth day of March 2016.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[18] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.